Thomas P. Smith, Jr.
Alison T. Conn
Todd D. Brody
Elizabeth Butler
Elizabeth Rosen
U.S. SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
New York, NY 10004
(212) 336-0080 (Brody)
brodyt@sec.gov
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, Plaintiff,<br><br>-against-<br><br>ERNEST OSSEI BOATENG; INTERCONTINENTAL WEALTH NETWORK LLC; and I WEALTH NETWORK LP, Defendants. | **COMPLAINT**<br><br>26-cv-5605 (    )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Ernest Ossei Boateng ("Boateng"), Intercontinental Wealth Network LLC ("Intercontinental"), and I Wealth Network LP ("I Wealth") (collectively "Defendants"), alleges as follows:

**SUMMARY**

1. From at least January 2020 until at least March 2026 (the "Relevant Period"), Boateng perpetrated a brazen multimillion-dollar Ponzi-like scheme targeting primarily Christians of Ghanaian heritage in New York and New Jersey.

2. Acting through two business entities he controlled, Intercontinental and I Wealth (the "I Wealth Entities"), Boateng solicited, recommended, and sold at least $16 million of securities in a pooled investment vehicle (the "I-Fund") to at least 200 financially unsophisticated and vulnerable investors (the "Investors").

3. Boateng's Investors included retirees, taxi drivers, home health care providers, students, and an ailing widow with young children. The Investors also included at least two churches and one prayer group, at least one of which intended on using the investment returns promised by Boateng to buy or build a church building.

4. Some of Boateng's Investors were immigrants to the United States.

5. If Investors did not have money available to invest, Boateng encouraged them to obtain the money via bank loans, credit card advances, or early withdrawals from their retirement accounts, promising them that he would cover any resulting costs.

6. In pitching the securities to the Investors, Boateng falsely and misleadingly promised the Investors that: (i) he would generate guaranteed annual returns on their money typically ranging from 25% to 100% (or more); (ii) earlier investors had received such promised returns; and (iii) their investments were safe and without risk, including informing at least some Investors that their investments were protected through "financial/investment insurance."

7. In fact, rather than investing the Investors' money as promised, Boateng diverted most of it for unauthorized purposes, including approximately $6.6 million to make Ponzi-like

payments to earlier Investors and at least $5.8 million to pay for personal expenses such as the purchase of a home.

8. To the limited extent that Boateng actually invested the Investors' money, he failed to invest it in low-risk investments or investments with fixed returns, as he promised. Instead, Boateng engaged in speculative and unsuccessful day trading, including options trading. Boateng's trading losses during the Relevant Period totaled more than $750,000.

9. Boateng also took steps to prevent the Investors from discovering his fraud. First, when certain Investors inquired about how their investments were performing, Boateng provided them with fabricated account statements falsely representing that the investments had grown by the promised rate of return. To make these account statements appear legitimate, Boateng personally affixed the logo of an SEC-registered brokerage firm on the statements, even though the brokerage firm played no role in the creation of the statements and no accounts had been opened at the firm in the names of any of the Investors.

10. Second, when Boateng was unable to provide Investors with their promised returns, he gave them numerous and shifting false excuses, including blaming the Commission for freezing Defendants' accounts, which never occurred; claiming that administrative issues prevented him from repaying them; and claiming that a change in the tax code would penalize the Investors who attempted to withdraw their money and that he was trying to find a workaround to avoid this penalty.

11. By virtue of the foregoing conduct and as alleged further herein, all Defendants have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. In addition, Defendants Boateng and

Intercontinental violated Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2), and (4)], and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

12. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

13. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and (d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

14. The Commission seeks a final judgment:

a. Permanently restraining and enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated;

b. Ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

c. Ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)];

d. Permanently restraining and enjoining Boateng from directly or indirectly, including but not limited to through any entity he owns or controls:

i. participating in the issuance, purchase, offer, or sale of any security;

provided, however, that such injunction shall not prevent Boateng from purchasing or selling securities listed on a national securities exchange for his own personal account, pursuant to Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Sections 21(d)(1) and 21(d)(5) [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)]; and

ii. acting as or being associated with any investment adviser, broker, or dealer; and

e. Ordering any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

15. This Court has jurisdiction over this action under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14(a)], and 28 U.S.C. § 1331.

16. Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

17. Venue lies in this district under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27(a) [15 U.S.C. § 78aa(a)], and Advisers Act Section 214(a) [15 U.S.C. § 80b-14(a)] because certain of the acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. Among other things, certain of the Investors who were defrauded by Defendants reside in this district.

**DEFENDANTS**

18. **Boateng**, age 44, is a resident of Pittstown, New Jersey. Boateng is the founder, control person, and sole owner of the I Wealth Entities. He has never been registered with the

Commission in any capacity, holds no professional or FINRA licenses, and has never been associated with a registered investment adviser or broker-dealer. In 2016, Boateng failed the Series 6 and Series 63 examinations.[1] Boateng has never been registered with any state as an investment adviser or investment adviser representative. During the investigation that preceded the filing of this action, the Commission staff issued a subpoena to Boateng to provide sworn testimony. At his testimony, Boateng declined to answer any substantive question regarding the facts as alleged in this Complaint, asserting his Fifth Amendment right against self-incrimination.

19. **Intercontinental**, founded in July 2017, is a New Jersey limited liability company with its principal place of business in Union, New Jersey. Intercontinental is owned and controlled by Boateng, and Boateng is Intercontinental's sole officer and director. Intercontinental has no employees. During the Relevant Period, Intercontinental served as the general partner, investment manager, and administrator of the I-Fund. Intercontinental has never been registered with the Commission in any capacity.

20. **I Wealth**, founded in October 2020, is a New Jersey limited partnership with its principal place of business in Union, New Jersey. Intercontinental is the general partner of I Wealth, and I Wealth is controlled by Boateng. I Wealth has no employees. During the Relevant Period, certain Investors were instructed by Boateng to send their money to I Wealth for investment. I Wealth has never been registered with the Commission in any capacity.

[1] The Series 6 examination "assesses the competency of an entry-level representative to perform their job as an investment company and variable contracts products representative. The exam measures the degree to which each candidate possesses the knowledge needed to perform the critical functions of an investment company and variable contract products representative, including sales of mutual funds and variable annuities." https://www.finra.org/registration-exams-ce/qualification-exams/series6. The Series 63 examination is the state law test for broker-dealer representatives. https://www.nasaa.org/exams/.

## FACTS

### I. Defendants Solicited Inexperienced Investors with False Promises

21. Boateng is originally from Ghana and immigrated to the U.S. in approximately 2016. Before and during the Relevant Period, he was part of a group of Christians of Ghanaian heritage who reside in New York and New Jersey (the "Ghanaian Group").

22. Many of the Investors were part of the Ghanaian Group, and some also were U.S. immigrants.

23. Boateng used the reputation and relationships he cultivated within the Ghanian Group to gain the trust of the Investors.

24. During the Relevant Period, Boateng told the Investors that he managed a pooled investment vehicle (the "I-Fund") and solicited them to invest in the I-Fund.

25. Boateng solicited the Investors through in-person meetings, telephone calls, and/or written communications, including email and text messages.

26. Boateng also made presentations about the I-Fund and/or about investing with the Defendants to at least two different churches and a prayer group affiliated with the Ghanian Group.

27. Some Investors heard about the I-Fund and/or about investing with the Defendants by word of mouth, including from others who had previously invested.

28. As Boateng knew, most of the Investors were inexperienced in finance and investing, and they trusted Boateng because of their shared religious, social, and community ties.

29. Defendants raised at least $16 million from at least 200 Investors.

#### A. Representations to Investors

30. In deciding to invest in the I-Fund or to invest otherwise with the Defendants, the Investors relied heavily on Boateng's oral and written representations.

31. In conversations with and in presentations to Investors during the Relevant Period, Boateng stated that he was an investment professional. Boateng's statements regarding his background and investment experience also led at least some Investors to believe that he was affiliated with a large financial services firm.

32. In fact, Boateng has never been affiliated with any Commission-registered entity and was not an investment professional.

33. At some of his in-person investment solicitations, Boateng used a slide deck presentation that included, among other things, admonishments to potential investors that "A good person leaves an inheritance for their children."

34. The slides Boateng showed to potential investors also stated that the "Product" (*i.e.*, the I-Fund) offered a "25% [return on] investment with compound interest" and would turn an investment of $24,000 into $1,000,000 in 10 years, at which point the investor could re-invest the $1,000,000 and receive an "investment return of $250,000/yr," allowing the investor to enter "retirement after 10 Years of Working."

35. Boateng touted the I-Fund to at least some of the Investors as an opportunity to amass "generational wealth" and to change the financial futures of the Investors and their families.

36. However, Boateng had never previously delivered such promised returns to Investors and he had no viable plan for doing so in the future.

37. As detailed in paragraphs 38-54 below, Boateng made a series of additional false or misleading oral statements to prospective I-Fund investors during the Relevant Period, either in person or by telephone.

38. Boateng told Investors that he was offering the I-Fund investment opportunity to Investors as friends and family and to demonstrate that God provided wealth to believers.

39. Boateng described the investment to Investors in various ways, including as a wealth building program, a supplemental income program, and a bond program.

40. Boateng told the Investors that the investment was intended to be a long-term investment (typically three years) and that, provided the Investors did not withdraw any money during the term of the investment, their investment would double in value.

41. Boateng represented to the Investors that the I-Fund investment strategy was successful; that prior investors had invested millions of dollars with him; and that such prior investors had all received their promised returns.

42. As Boateng knew or recklessly disregarded, his statements to prospective investors regarding the success of the I-Fund were false or misleading, as he had never generated sufficient proceeds using the I-Fund investment strategy to pay earlier investors their promised returns. Rather, Boateng used money from later investors to pay certain investors in a Ponzi-like manner.

43. Boateng also told the Investors that their profits were guaranteed, and that the investments carried little to no risk. In connection with these representations regarding the risk of the investment, Boateng told certain Investors that their investments were protected through "financial/investment insurance."

44. In fact, Boateng used Investor money (1) to pay earlier investors; (2) for his own personal use; and (3) to make high-risk investments, including frequent, high volume trading and options trading, and he had no investment insurance or other means to guarantee Investor profits or protect Investors against loss.

45. Boateng told at least some of the Investors that the Defendants would not charge Investors any fees in connection with their investments in the I-Fund.

46. In fact, Boateng misappropriated a significant amount of the Investors' money for his own personal use, including to buy his family home.

47. When certain Investors did not have money available to invest in the I-Fund, Boateng encouraged them to take out bank loans, obtain credit card advances, or make early withdrawals from their retirement accounts, which many did.

48. Boateng told the Investors who took out personal loans (the "Loan Investors") that Defendants would remit a portion of the I-Fund's investment proceeds to the Loan Investors each month to allow them to make the monthly payments to the loan providers.

49. Boateng also told the Loan Investors that when their loans had been paid off (at the "maturity date") the Loan Investors would receive a return equal to the principal amount of their loan at origination.

50. In fact, to the extent Boateng paid the Loan Investors their monthly loan repayments, that money did not come from the I-Fund's investment proceeds but rather from other Investors.

51. At least some of the Loan Investors were not paid their promised returns at the investments' maturity.

52. Likewise, Boateng knew that the Investors who withdrew money from existing retirement accounts (*e.g.*, 401ks or IRAs) to invest in the I-Fund (the "Retirement Account Investors") would incur penalties associated with withdrawing money from those accounts.

53. Boateng falsely and misleadingly promised the Retirement Account Investors "special" compensation, typically an additional 15% return in the first year of the investment to

"settle" or cover the cost of these penalties. Boateng knew or recklessly disregarded that this representation was false or misleading as he had never generated sufficient proceeds using the I-Fund investment strategy to pay this special compensation.

54. In fact, Boateng did not pay at least some of the Retirement Account Investors the promised special compensation.

**B. Investment Documents**

55. During the Relevant Period, Boateng provided at least some Investors with documents relating to their investments, including a "Confidential Private Offering Memorandum" (the "Offering Memorandum"), "Investment Strategy & Agreement" (the "Investment Agreement"), and a "Certificate of Deposit" (the "Certificate") (collectively the "Investment Documents").

56. Boateng knew or was reckless in not knowing that at least some of the Investors did not understand or read the Investment Documents. As such, Boateng orally provided information about the investments to some Investors to aid in their investment decision.

**i. Offering Memorandum**

57. Boateng created the Offering Memorandum and had ultimate authority over the representations and information contained therein.

58. The Offering Memorandum, which was approximately 50 pages long, stated on its cover page that it was from Intercontinental, and it also identified Intercontinental as the "general partner" and "investment manager."

59. The Offering Memorandum stated that the Investors would play no part in the management of the I-Fund and would have no authority or right to act on behalf of the I-Fund in connection with any matter.

60. The Offering Memorandum stated that the I-Fund's profits would be allocated proportionately among the Investors, based on each Investor's *pro rata* share of the I-Fund's assets.

61. The Offering Memorandum represented that the "objective" of the I-Fund was to "generat[e] annual absolute returns TRADING" (capitalization in original) and described the I-Fund's trading program as "seek[ing] capital protection and appreciation primarily through event-driven and value trading in publicly traded securities."

62. The statements set forth in paragraph 61 above were false or misleading because, as Boateng knew or recklessly disregarded, the I-Fund had no such objective or trading strategy.

63. The Offering Memorandum stated that the investment was "suitable only for sophisticated investors" and that its trading program was "speculative" and "entail[ed] substantial risks," Boateng, however, made numerous oral representations to the Investors that the investment was safe and guaranteed, knowing that he was targeting unsophisticated investors who were unlikely to read the Offering Memorandum.

**ii. Investment Agreement**

64. Boateng created the Investment Agreement and had ultimate authority over the representations and information contained therein.

65. The Investment Agreement consisted of two documents: (1) a one-page sheet titled "Net Annual Returns;" and (2) an Investment Management Agreement.

66. The cover page of the Investment Agreement stated that it was from Intercontinental.

67. The Net Annual Returns sheet summarized I-Fund's investment strategy, stating that the Investors' money would be invested in "securities" alongside "[m]illions of dollars [that] are managed across [the I-Fund] and [its] managed accounts."

68. The statements in paragraph 67 above were false or misleading because, as Boateng knew or recklessly disregarded, as a result of Defendants' use of Investor money to make Ponzi payments to earlier Investors, Defendants' misappropriation of I-Fund assets, and the I-Fund's trading losses, Defendants were not managing "millions of dollars." Throughout the Relevant Period, the assets under management in the relevant brokerage accounts ranged, on a monthly basis, from $0 to approximately $840,000.

69. The Investment Management Agreement broadly described the I-Fund's investment strategy in terms similar to the Offering Memorandum, stating that the I-Fund was focused on "event-driven" and "intrinsic value investing, with the objective of generating absolute returns that exceed equity and event-driven hedge fund indices." Just as in the Offering Memorandum, these descriptions of the I-Fund's investment strategy were false or misleading because, as Boateng knew or recklessly disregarded, the I-Fund employed no such strategy.

70. The Investment Management Agreement stated that "the company" or "the Partnership" (*i.e.* the I-Fund) retained Intercontinental as the "Investment Manager" "to provide investment management and advisory services."

71. The Investment Management Agreement provided that Intercontinental (as Investment Manager) was retained "to manage the investment of all cash, securities and other assets of the company" and that the Intercontinental had "full power, discretion[,] and authority to make all investment decisions concerning the [I-Fund]."

72. The Investment Management Agreement was signed by Boateng as Intercontinental's "financial service professional."

73. Pursuant to the Investment Management Agreement, Intercontinental was entitled to a quarterly management fee equal to 0.5% of the net asset value of each capital account under management. In addition, Intercontinental was entitled to a 20% performance fee "from the investment annual profit."

74. The statements in paragraph 73 above were false or misleading because, as Boateng knew, Defendants did not maintain capital accounts for each of the I-Fund investors.

75. The statements in paragraph 73 above were also false or misleading because, as Boateng knew, any money transferred to Defendants was not remitted pursuant to the fee provisions in the Investment Documents, but rather as a result of Defendants' misappropriation of the I-Fund's assets. Additionally, the amounts Defendants misappropriated greatly exceeded the amounts provided for by fee provisions of the Investment Documents. During most of the Relevant Period, the I-Fund's investment did not generate any annual profits.

76. Boateng told at least certain Investors that Defendants would not take any compensation in connection with the Investors' investments. This statement was false or misleading because of Defendants' misappropriation of the I-Fund's assets.

### iii. Certificates

77. Boateng created the Certificates and had ultimate authority over the representations and information contained therein.

78. Intercontinental's name was displayed across the top of the Certificates.

79. The Certificates purported to memorialize the terms of each Investor's investment, "certify[ing]" that the named Investor had "deposited" a specified amount of money "in an investment" made "through Intercontinental."

80. Boateng signed the Certificates, in some instances as "Advisor," and in others as "IWealth Rep."

81. The Certificates stated that 100% of the Investors' money was deposited into the I-Fund. That statement was false or misleading because, as Boateng knew or recklessly disregarded, he had not in fact deposited all of the Investors' money in the I-Fund but had instead misappropriated significant amounts of Investor money to pay other Investors and himself.

82. Most of the Certificates included guaranteed rates of return, which were expressed as "fixed rate[s]," with 25% per annum being the typical rate of return, although some of the Certificates provided for returns as high as 100% or more per annum. Those statements were false or misleading because, as Boateng knew or recklessly disregarded, Defendants never delivered such promised returns to investors and had no viable plan for doing so.

83. Many of the Certificates specified the type of investment in which the Investor's money was purportedly invested (*e.g.*, a wealth building program) and/or the brokerage or other account into which Defendants had placed the Investor's money (*e.g.*, "a brokerage account with [financial firm]").

84. The representations in paragraph 83 were false or misleading because, as Boateng knew or recklessly disregarded, the characterizations of the investments did not accurately reflect the investments that the Investor's money had been used to purchase.

85. The representations in paragraph 83 were also false or misleading because, as Boateng knew or recklessly disregarded, in many instances the Investor's money had not been sent to the brokerage or other account identified in the Certificate.

86. The Certificates also emphasized the low risk of the investment, with many stating that the investment was covered by "financial/investment insurance." These statements were false or misleading because, as Boateng knew or recklessly disregarded, the I-Fund was engaged in high risk, frequent trading, and Defendants had not acquired the insurance described in the Certificates.

87. The Certificates included a stated "term," which ran from a matter of months to a number of years, with the typical duration being three years.

88. The Certificates also contained a "maturity date," or the date on which Intercontinental agreed to pay the Investor his or her return on the investment.

89. The representation that Investors would be repaid on the maturity date was false or misleading because, as Boateng knew or recklessly disregarded, Defendants had neither the intention nor the ability to deliver the promised returns to Investors on any date, let alone the specified maturity date.

90. Virtually all of the Certificates included an automatic renewal provision, which renewed the investment as of the maturity date.

**C. The I-Fund Investments Are Securities**

91. The investments in the I-Fund were securities, as they constituted both an "investment contract" and a "note."

**i. The I-Fund Investments were Investment Contracts**

92. Both orally and in the Investment Documents, Boateng described the I-Fund investment opportunity to the Investors as an investment in securities.

93. The Investors contributed money to a common enterprise—the I-Fund—with the expectation of profits derived solely from Boateng's efforts.

94. The Investors had no role in managing the I-Fund or its investments.

95. All Investor money was pooled in Defendants' bank accounts without segregation. To the extent the Investors' money was sent to other accounts for investment, such as to brokerage accounts, that money was also pooled, without segregation.

96. All Investors shared the same underlying risk.

97. The Investors' primary motivation was to earn the considerable returns that Boateng promised—typically between 25% and 100% per annum.

**ii. The I-Fund Investments were Also Notes**

98. Each Certificate is a written instrument containing an unconditional promise by Intercontinental to pay a fixed sum to a specific investor on a definite date.

99. The Certificates were offered broadly and without restriction and contained no provisions limiting their transfer of resale.

100. No alternate regulatory scheme outside of the one provided under the federal securities laws protects the interests of the Investors from schemes like those of Defendants.

## II. Defendants Misappropriated Investor Money for Boateng's Personal Use and to Make Ponzi-Like Payments to Earlier Investors

101. Before and during the Relevant Period, Boateng opened numerous bank accounts on behalf of each of the Defendants (the "Bank Accounts") and was the authorized person and signatory on all such accounts.

102. Boateng controlled the Bank Accounts.

103. Boateng also opened brokerage accounts on his own and on Intercontinental's behalf (the "Brokerage Accounts").

104. Boateng controlled the Brokerage Accounts and authorized the transactions in the Brokerage Accounts.

105. Boateng told the Investors to which of the Bank Accounts to send their I-Fund investment monies.

106. Following Boateng's instructions, the Investors sent approximately $15.2 million to Intercontinental's bank accounts, approximately $1 million to I Wealth's bank accounts, and at least $480,000 to Boateng's personal bank accounts.

107. While Defendants represented to the Investors that 100% of their money would be invested, Defendants used, at most, only about half of the money that Investors contributed to the I-Fund for investment activity.

108. The I-Fund never generated the returns Boateng promised Investors, and Boateng used money raised from later Investors to pay earlier Investors.

109. In total, Boateng diverted approximately $6.6 million of Investor money to make payments of purported principal and interest to earlier Investors.

110. Boateng paid the earlier Investors in order to maintain and conceal his fraud.

111. In addition, Boateng misappropriated at least $5.8 million of Investors' money for his personal use—including to buy, renovate, and furnish a personal residence; to make cash payments to and/or on behalf of members of his family and himself; and to lease a car.

112. On numerous occasions, shortly after Investors deposited their money for investment in the I-Fund, Defendants promptly diverted it for purposes other than investing in securities.

113. For example, on November 3, 2023, Boateng transferred $112,000 from an Intercontinental brokerage account to an Intercontinental checking account, where it was pooled with money recently deposited by certain Investors, resulting in a $220,000 checking account balance. Within days, Boateng misappropriated this money: on November 6, 2023, Boateng used $200,000 from the checking account as a down payment on his new home, withdrew $6,000 in cash, and donated $5,000 to his church; on November 7, 2023, Boateng used $875 from the checking account to pay for a septic system inspection for his new home; and on November 10, 2023, Boateng used $7,000 from the checking account to repay an existing Investor.

114. Similarly, on November 7, 2025, Boateng deposited $20,000 from an Investor into an Intercontinental checking account (which prior to that time, had an existing balance of $221.77). Rather than invest the money as promised, Boateng withdrew $180 in cash that same day; and on November 10, 2025, transferred $19,000 to two existing Investors in Ponzi-like payments and spent $134.09 at fast-food restaurants.

115. Likewise, on May 14, 2024, Boateng deposited a $50,000 check from an Investor made out to "I Wealth Network LP" into an I Wealth bank account and the following day, withdrew $6,000 from the account and transferred $30,000 to an Intercontinental bank account. Shortly thereafter, Boateng sent two $3,000 payments to two other Investors.

116. On September 10, 2025, an Investor wired $10,000 to an I Wealth bank account. Within a day, Boateng had sent nearly $6,700 from that I Wealth bank account to other Investors, misappropriated $1,000 for his personal use, and sent $1,300 to an Intercontinental bank account.

117. Boateng did not tell Investors that their money would be used for his personal expenses or to make Ponzi-like payments to earlier Investors.

## III. Boateng and Intercontinental Made High-Risk Investments with I-Fund Assets

118. Defendants represented to the Investors that 100% of their money was being invested in low-risk securities transactions.

119. Contrary to those representations, only approximately half of Investors' money was ever invested. Moreover, the money that Defendants did invest was not invested in low-risk, safe investments with guaranteed results or fixed returns, as Defendants had promised.

120. As the "investment professional" for Intercontinental (as well as Intercontinental's only officer and director), the I-Fund's Investment Manager, Boateng was responsible for all of Intercontinental's duties, including selecting the securities in which the I-Fund invested.

121. Under the terms of the Investment Documents, Intercontinental was entitled to collect certain fees for its investment management services.

122. Notwithstanding the fact that Boateng represented to at least some Investors that he and Intercontinental would not collect such fees, Boateng withdrew at least $5.8 million from the money Investors contributed to the I-Fund for his own personal use.

123. Boateng sent only approximately $5.4 million of the Investors' money to the Brokerage Accounts for investment purposes. The investments Boateng made on behalf of

Intercontinental and the I-Fund, however, were neither low-risk nor designed to generate guaranteed profits of at least 25% per annum.

124. Instead, to the extent Boateng invested the Investors' money, he engaged in high-frequency, high-volume, trading of both stocks and options (calls and puts).

125. Boateng's investment strategy involved day trading, which is generally considered to be a high-risk, speculative trading strategy.

126. During certain extended periods of time during the Relevant Period, Boateng did not effect any securities transactions in the Brokerage Accounts. For example, Intercontinental almost entirely abstained from securities trading for nine months in 2022 and six months in 2023, and it held only minimal assets in the Brokerage Accounts during those periods.

127. The securities trading pattern that Boateng executed contradicted the investment strategy that he and Intercontinental had described to the Investors. For example, some of the Certificates stated that the investors were investing in the I-Fund through a "bond" program and others through a "VIX Trading" program. However, not a single dollar of the investor/I-Fund money was ever invested in bonds or investment products related to the VIX Cboe Volatility Index.

128. During the Relevant Period, Boateng's trading resulted in net losses of approximately $750,000.

129. Many of the Certificates falsely represented that Investors' money was deposited into one or more brokerage accounts at a particular financial services firm.

130. In fact, from 2022 onward, the I-Fund did not deposit any money into its brokerage accounts at that firm, nor use the assets in such accounts to buy or sell securities.

131. Boateng also directed that approximately $2.7 million of Investor money be invested in high-risk investments outside of the Brokerage Accounts (the "Outside Investments").

132. With limited exceptions, Defendants did not disclose the Outside Investments to the Investors.

133. The Outside Investments included Boateng's deposit of at least $1.1 million of Investor money in the escrow account of an attorney located on Long Island, which generated no investment return for the Investors.

134. Additionally, and contrary to the representations in the Certificates, Defendants did not acquire "financial/ investment insurance"—or any other type of insurance—to safeguard the Investors' investments.

## IV. Boateng's Efforts to Conceal the Fraud

### A. The Fake Account Statements

135. When certain Investors inquired about the status of their investments, Boateng fabricated account statements that he provided to those Investors, which falsely showed that their investments were performing as he had promised.

136. To give the fabricated account statements a hallmark of authenticity, Boateng placed the logo of an SEC-registered brokerage firm on them (the "Financial Firm").

137. The Financial Firm had no involvement in the creation of these account statements and, in fact, did not maintain individual accounts for the Investors.

138. The fabricated account statements falsely indicated that the Investors' money had been deposited into a specific account at the Financial Firm and that the I-Fund was performing

as promised (showing the purported gains in the account based on Defendants' promised rate of return).

139. The information in these account statements bore no relation to the actual balance of the referenced brokerage account or the value of the I-Fund's assets.

### B. Boateng Lies to the Investors about the Reasons for Non-Payment

140. When the Investors' investments "matured," *i.e.* reached the end of their term, Boateng provided numerous false and shifting explanations as to why he could not provide the Investors their promised returns or even their original principal.

141. For example, Boateng told certain Investors that the Commission had "frozen" his accounts, knowing that the Commission had not frozen any of Defendants' accounts.

142. Boateng also told certain Investors that a change in the tax law would require the Investors to pay draconian penalties on any returns paid to them unless Boateng and his purported team were able to resolve the issue. As Boateng knew or recklessly disregarded, no such change in the tax law occurred, and Defendants were not involved in any discussions to "resolve" this non-existent tax issue.

143. Boateng also falsely told certain Investors that, although he could not currently pay their returns due to purported administrative issues, the money was available to be distributed once those issues were resolved.

## TOLLING AGREEMENTS

144. Defendants entered into tolling agreements with the Commission, in which they agreed to toll any statute of limitations applicable to the conduct and claims alleged herein for the period between April 23, 2026 and October 21, 2026.

## FIRST CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a)
### (All Defendants)

145. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 143.

146. Defendants Boateng, Intercontinental, and I Wealth, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails: (1) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud; (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

147. By reason of the foregoing, Defendants Boateng, Intercontinental, and I Wealth directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder (All Defendants)

148. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 143.

149. Defendants Boateng, Intercontinental, and I Wealth, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly: (i) employed one or more devices, schemes, or artifices to defraud; (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

150. By reason of the foregoing, Defendants Boateng, Intercontinental, and I Wealth, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Advisers Act Sections 206(1) and 206(2) (Boateng and Intercontinental)

151. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 143.

152. At all relevant times, Defendants Boateng and Intercontinental were investment advisers to the I-Fund as defined in Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)].

153. Defendants Boateng and Intercontinental, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly have: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client; and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

154. By reason of the foregoing, Defendants Boateng and Intercontinental, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**FOURTH CLAIM FOR RELIEF**

**Violations of Advisers Act Section 206(4) and Rule 206(4)-8 Thereunder**
**(Boateng and Intercontinental)**

155. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 143.

156. At all relevant times, Defendants Boateng and Intercontinental were investment advisers within the meaning of the Advisers Act.

157. At all relevant times, the I-Fund was a pooled investment vehicle as defined in Advisers Act Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].

158. By engaging in the conduct described above, Boateng and Intercontinental, directly or indirectly, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce: (i) made one or more untrue statements of material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; and/or (ii) otherwise engaged in one or more acts,

practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to Investors or prospective Investors in the pooled investment vehicle.

159. By reason of the foregoing, Defendants Boateng and Intercontinental have violated and, unless enjoined, will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently enjoining Defendants Boateng, Intercontinental, and I Wealth, their agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently enjoining Defendants Boateng and Intercontinental, their agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, from violating, directly or indirectly, Advisers Act Sections 206(1), 206(2), and 206(4) [15 U.S.C. §§ 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

### III.

Permanently restraining and enjoining Defendants Boateng and Intercontinental from, directly or indirectly, including but not limited to through any entity owned or controlled by Defendants Boateng or Intercontinental, participating in the issuance, purchase, offer, or sale of

any security; provided, however, that such injunction shall not prevent Boateng from purchasing or selling securities listed on a national securities exchange for his own personal account pursuant to Securities Act Section 20(b) [15 U.S.C. § 77t(b)]; Exchange Act Sections 21(d)(1) and (21(d)(5) [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5))]; and Advisers Act Section 209(d) [15 U.S.C. §80b-9(d))]; and

**IV.**

Permanently restraining and enjoining Defendants Boateng and Intercontinental from, directly or indirectly, being associated with any investment adviser, broker, or dealer, pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. §78u(d)(5))]. For purposes of this injunction: (a) a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser; (b) a person is associated with a broker or dealer if such person is a partner, officer, director, or branch manager of such broker or dealer (or occupies a similar status or performs similar functions), directly or indirectly controls, is controlled by, or is under common control with such broker or dealer, or is an employee of such broker or dealer; and (b) a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or occupies a similar status or performs similar functions), or directly or indirectly controls, or is controlled by such investment adviser. Including any employee of such investment adviser;

**V.**

Ordering Defendants Boateng, Intercontinental, and I Wealth to disgorge, on a joint and several basis, all ill-gotten gains they received, directly or indirectly, with prejudgment interest

thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**VI.**

Ordering Defendants Boateng, Intercontinental, and I Wealth to pay civil monetary penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and

**VII.**

Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
September 10, 2026

/s/ Todd Brody

Thomas P. Smith, Jr.
Alison T. Conn
Todd D. Brody
Elizabeth Butler
Elizabeth Rosen
U.S. SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0080 (Brody)
brodyt@sec.gov
*Attorneys for Plaintiff*